## Case No. 12,433.

### SCAMMON v. COLE et al.

[1 Hask. 214; [1] 3 N. B. R. 393 (Quarto. 100).]

District Court, D. Maine. July, 1869.

BANKRUPTCY — INSOLVENCY — USUAL COURSE OF BUSINESS—KNOWLEDGE OF INSOLVENCY.

1. Insolvency, within the meaning of the bankrupt act, is an inability to pay debts in the ordinary course of business as persons in trade usually do.

2. A mortgage, given within four months of bankruptcy, by a debtor who was insolvent, to a person liable as surety or indorser upon the debtor's notes, to secure the payment of a loan with which such notes were paid, and with an intent to give the mortgagee a preference, the mortgagee having reasonable cause to believe the debtor insolvent, is a preference within the 35th section of the bankrupt act [of 1867 (14 Stat. 534)].

 [Cited in Singer v. Sloan, Case No. 12,899; Hall v. Wager, Id. 5,951; Goodenow v. Milliken, Id. 5,535; Martin v. Toof, Id. 9,167; Buchanan v. Smith, 16 Wall. (83 U. S.) 307.]

3. A mortgage, so given, is not a transaction in the usual and ordinary course of business, and is prima facie fraudulent.

 [Cited in Mathews v. Riggs, 80 Me. 107, 13 Atl. 48.]

4. Such mortgagee's knowledge of the insolvency of the debtor is immaterial, if he had reasonable cause to believe him insolvent.

 [Cited in Buchanan v. Smith, 16 Wall. (82 U. S.) 308; Singer v. Sloan, Case No. 12,-899.]

[This was a bill in equity by John I. Scammon, assignee, against Thomas H. Cole and others.]

Bill by the assignee of Chadbourne & Nowell, bankrupts, to set aside a mortgage made by them within four months of their bankruptcy as a preference under section 35 of the bankrupt act. Respondents by answer denied that the mortgage was a preference, but averred that it was given as security for a loan made at the time. The cause was heard upon bill, answer and proofs.

John Rand, for orator.

Almon A. Strout and George F. Shepley, for respondents.

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

FOX, District Judge. This is a bill in equity, brought by the assignee of the bankrupts to set aside a mortgage of their stock in trade, fixtures, tools, baggage wagon, and pung, made by them to the respondents on the 17th of June, 1868, to secure the payment of their notes of that date, one given to Cole for $1,272.50, and one to Hooper for $1,547.-61, payable on demand with interest.

Chadbourne & Nowell were furniture dealers at Biddeford, and were adjudged bankrupts on the petition of one of their creditors, filed on the 11th of July, 1868. This mortgage covered all the firm estate, excepting one horse which was not subject to attachment by the laws of this state, and as a part of the same transaction, Chadbourne at the same time mortgaged to the respondents all his real estate, to secure the payment of these notes. Nowell is not shown to have had any separate estate. The value of the property in question does not definitely appear. All the evidence on this point is from Chadbourne, who states, that a few days after the execution of the mortgage they took an account of stock, and that their assets, including all demands due the firm, were $6,687.

It is claimed that this mortgage of the partnership estate was in fraud of the 35th section of the bankrupt act. The examinations of Chadbourne and of the respondents have been read in evidence by the complainant. Chadbourne testifies: "The firm commenced business in 1864, each partner contributing $1,500 as capital. June 16th I informed Cole that the firm had some paper in the bank that was overdue, and they wanted to raise money to pay it, and asked his advice what to do. Cole inquired what we wanted to do, and I told him we thought of mortgaging our stock to raise some money. Cole said he would see Hooper, and thought he could arrange it. After that I went with Cole to Hooper. Cole said: 'If you will give us a mortgage on your stock of goods and on your real estate, we will assist you.' They asked how much I wanted to raise. I told them about $3,000. They asked for what we wanted it; told them to pay $1,250 to First National Bank of Biddeford, part of which was overdue and had Hooper's name on it; about $750 was then overdue, and $500 was falling due; that there was $300, with Hooper's name on it, at the First National Bank of Saco; that we wanted $500 of it to pay my note to Gardner Libby, on which Cole and A. Jones were sureties, and which was overdue; that there was a note at the savings bank, given by Nowell, on which Cole and I were sureties, and that we owed Cole $250 for borrowed money. I think we told Cole we were liable to be called upon for these liabilities at any time, and that as we were going to mortgage our stock to raise some money, we might as well get enough to pay this, so that we might go along in our business. Cole said, if we would

give a mortgage of the stock and real estate, as we had proposed, they would furnish us with money to pay our liabilities. There was some conversation at the interview when the papers were made in relation to our other liabilities. They inquired how much we owed in Boston. I replied that my partner told me that we owed about $1,500. I may have said $1,500 or $2,000. I think they asked me if I knew how much we owed and that I told them I did not know but would ascertain. Hooper gave up the notes to me that were in the bank $1,250, and $300 in money. Cole paid note to G. Libby and interest, $522, and now holds it, and also the note in the savings bank for $500 against Nowell as principal and Cole and myself as sureties. We gave a note to Hooper for $1,550, and to Cole for $1,272.60, both of which were secured by both mortgages. That note to Cole was to pay the two notes above mentioned, and our indebtedness of $250 for borrowed money. The defendants did not know, to my knowledge, that we were unable to pay our liabilities as they became due, but they did know the notes in the bank were overdue and unpaid. The firm did not know that they were unable to meet their liabilities as they fell due. We made the mortgage to raise money to meet the notes which were due and about coming due; did not give them this mortgage to secure a preference. The firm was then insolvent." On cross examination he testifies, "We did not know and had no reason to believe we were insolvent at this time. We did not contemplate bankruptcy or insolvency, or expect to stop our business; did not know our condition until we took account of stock afterwards. We had two extensions from T. M. Holmes & Co. of Boston the last of 1867, and again about June 1st, 1868; had several extensions from Boston creditors."

From a schedule, annexed to Chadbourne's examination, it appears the firm was indebted over $10,000, but I do not find on this list the Libby note, or the note to the savings bank. These were, to be sure, individual liabilities, which, if added to this amount, would make their joint and several liabilities over $11,000.

The 35th section of the bankrupt law declares "that if any person being insolvent, or in contemplation of insolvency, within four months before the filing of the petition by or against him, with a view to give a preference to any creditor or person having a claim against him, or who is under any liability for him, * * * makes any payment, pledge, assignment, transfer, or conveyance of any part of his property, either directly or indirectly, absolutely or conditionally, the person receiving such payment, &c., or conveyance, &c., having reasonable cause to believe such person is insolvent, and that such payment, &c., conveyance, &c., is made in fraud of the provisions of this act, the same shall be void, and the assignee may recover the property, or the value of it, from the person so receiving it, or so to be benefited. * * * And if such sale, &c., is not made in the usual and ordinary course of business of the debtor, the fact shall be prima facie evidence of fraud."

To invalidate the transfer it must appear that the debtor, at the time, was insolvent or in contemplation of insolvency, and that he intended to give a preference to a creditor, or person having a claim against him, or to one who is under a liability for him.

In this case Chadbourne admits the firm was deeply insolvent at the time the mortgage was given, but he avers that they were not aware that such was their condition until afterwards, when an examination was made as to their assets and liabilities, and it appeared that they could not pay more than twenty or twenty-five per cent. Chadbourne did not keep the books, and may not, therefore, have been so conversant with their real condition as his co-partner, whose testimony is not before me, but who, I cannot but believe, was well aware of the insolvency of the firm.

In the determination of questions in bankruptcy, it must be remembered that "insolvency," as used in the bankrupt act, does not mean an absolute inability to pay one's debts at a future time, upon a settlement and winding up of all a trader's concerns, but a trader may be said to be in insolvent circumstances when he is not in a condition to pay his debts, in the ordinary course, as persons carrying on trade usually do. This definition has been substantially adopted by every district judge in the country, before whom the question has arisen.

I. What was the situation of this firm June 17th? Their assets of every kind, including all debts due to them, were a little under $6,700, and Chadbourne was also the owner of his homestead and a small lot adjoining. Their liabilities, individually and as a firm, were in excess of $11,000. A note in the Biddeford bank of $500 had been overdue for more than a week; another note of $250, in the same bank, had been overdue some days, and both were renewals of former notes, and were endorsed by Hooper, one of the respondents. The same bank had two other and similar notes, each for $250, and the Saco bank a similar note for $300, all of which would soon fall due, and which Chadbourne admits they could not pay, excepting by a mortgage of their stock. Chadbourne's note of $500 was also due to Gardner Libby, on which Cole was surety, and there was a note of Nowell's for $500 at the savings bank on which Cole and Chadbourne were responsible, and for all which, as Chadbourne states, they were liable to be called upon at any time. They owed Cole $250 for borrowed money, one-half of which had been standing four or five months. They had also been obliged to apply to some of their general

creditors for an extension of their liabilities, and twice in particular, to their heaviest creditor, T. N. Holmes & Co., to whom they were at this time indebted $1,080, being for two acceptances of $216 each, and a third of $216.70, given June 12, 1868, in renewal of the following notes, which were given in settlement of merchandise account, to wit: One for $219.50 dated Aug. 10th, 1867, on three months; one for $323.75 dated January 3d, 1868, on four months, and one for $83, April 1st, 1868, on four months; one draft for $206, dated June 12th, 1868, on three months, and one for $215.60 of June 20th, the two last being given in settlement of accounts for merchandise. They had also renewed a note of Marrett, Poor & Co.'s of April 25th, and to quote Chadbourne's language, "We had applied to our Boston creditors several times for an extension of our notes and accounts during the year 1868, and prior to the 10th of June."

They were owing Joseph Dennet $400 for money loaned years before, and for which he held their note payable on demand; William O. Brown $1,200 for money loaned April 1st, 1867, for which he had a similar note, and from their schedule, it appears they were indebted to others to the amount of about $1,200 for money borrowed by them at various times, some as far back as December, 1867. There were also two notes held by the banks for $350, but as neither of the respondents were answerable upon them, these notes were not paid or secured.

These facts satisfy me, notwithstanding the statements of Chadbourne, who may not have had a clear understanding of the legal definition of insolvency, that they could not but be aware, at this time, of the firm's being insolvent. Twelve hundred and fifty dollars of their paper on which the respondents were liable were then overdue and unpaid. A large amount of borrowed money was due to other parties, which they were liable to be called upon to discharge at any moment, and none of which could they meet, excepting by the suicidal course of mortgaging their stock in trade. They had obtained several extensions of their business liabilities, especially from Holmes & Co., one of whose notes for $219.50 had remained overdue and unpaid from the 10th day of the preceding November until the 12th day of June, only five days before this mortgage was executed, when it was taken up and included in new drafts given in extension, together with another note of $323.75, which fell due May 3d, and remained unpaid until included in these drafts.

Their business for more than six months had not "been carried on as traders usually do business;" their business notes were overdue and unpaid; they owed more than $2,000 for borrowed money, some of it due for more than a year; their bank liabilities were also overdue and unsatisfied, and in my view, on the 10th of June they were not only insolvent, as they admit the fact to have been, but they were fully conscious of the existence of all the circumstances which made them insolvent; and under such a state of facts, but little reliance can be placed by the court in the statement of the bankrupt, that at that time they had no reason to believe they were insolvent.

II. Was this mortgage executed by the bankrupts with a view to give a preference to any creditor or person having a claim against them, or who was under any liability for them?

The mortgage was not given to secure the original liability of the respondents, but they loaned to the bankrupts the money to discharge these liabilities, with the exception of the amount due Cole, and received the mortgage to secure these amounts. It is claimed by the answer, that the mortgage therefore was given to secure a present consideration, and not an existing liability.

Such a construction of this transaction cannot be sustained under the provisions of the bankrupt act; if it could be, all an endorser or surety need do to obtain valid security for his liability would be to lend his principal the amount with which to pay the debt, and receive back a mortgage as security for the loan. Such a proceeding, within the purview of the bankrupt act, is nothing more than an exchange or substitution of securities, a mere attempt and contrivance to relieve or protect an endorser or surety, and whatever means may be adopted to accomplish this purpose, it will prove invalid under the bankrupt law, when it is designed and used to obtain a preference for the party who is under a liability for the bankrupt. In the present case, the security in all respects would have been equally valid, if it had been so drawn as in terms to indemnify the respondents as endorsers or sureties on the notes for which they were liable.

The testimony of Nowell, who was the bookkeeper and probably more conversant with the condition of the firm than Chadbourne, has not been taken, as he has left the state, and we must judge of his motives and purposes from the course adopted and its natural consequences. Chadbourne states that his purpose in making the mortgages was to meet the notes that were due and about coming due, and that he did not give them to Hooper and Cole to give them a preference over the other creditors.

Whilst I have no doubt that he desired to meet these notes, I feel equally confident that he did intend, by these mortgages, to protect Hooper and Cole against loss, and that they should be secured at any rate against all liability; all the circumstances compel me to this conclusion. Both members of the firm knew that they had not met their payments as they fell due; their liabilities to the amount of $1,500 were then overdue, including the money due to Cole, and they had no means to pay these sums, excepting the money re-

ceived from Hooper and Cole on this security.

On the 12th of this very month, they were indebted to Holmes & Co. over $1,000, part of which was on notes which were overdue, and one of which had been so for six or seven months. Instead of giving them any security or preference, they asked and obtained an extension for the whole amount. They were owing two other notes to the banks on which other parties were sureties or endorsers, one of which, at least, was a renewal, but neither of these notes was paid or secured although they were soon payable. They were owing other parties in Biddeford and Saco about two thousand dollars for borrowed money, some of it for more than a year, but none of these did they think proper to secure in any way, but they did secure every dollar for which either of these respondents could in any way be made accountable for the firm or either of its members, although a portion of it was not then due and payable.

If their object, as is now claimed, was to relieve themselves from their bank liabilities and paper falling due, why did they not pay these other notes, which were held by these same corporations? Why make this distinction, and pay those, and only those, for which the respondents would be accountable, leaving all the others unpaid or unsecured?

Again, why should the firm pay the savings bank Nowell's individual debt? This was not a firm liability, it was Nowell's private note, on which Cole and Chadbourne were sureties, and so far as it appears, was not due at that time, and if it had been, such institutions are always ready to loan their funds on good security, and the bank would not, probably, have pressed for payment, if the parties were in good credit, and desired further time or a renewal of the loan.

Why pay Chadbourne's note of $500 to Gardner Libby? What reason, other than to protect the surety Cole, is shown for selecting this liability of one of the members of the firm and discharging it with the co-partnership assets, whilst there were over due and unpaid large amounts of borrowed money loaned the firm, and for which the lenders had no security.

It thus appears that they were not satisfied with discharging the claims against the firm, upon which these respondents were liable, but they also undertook to discharge, with the firm property, the individual liabilities of each member to the amount of $500, or rather, to allow Cole to pay these individual liabilities for which he was accountable as surety, and receive therefor, from the firm, the partnership note for the amount thus paid, secured by a mortgage of the partnership estate. The firm was under no liability for this amount. It could not be made accountable for it, or be compelled to apply its property to its discharge. Chadbourne took legal advice about these mortgages, and was probably aware that as these claims then stood neither the holders nor the sureties could look to the firm

for payment. Why should the firm pay or assume these demands, or charge its property with the payment of them, unless the object and purpose was to relieve the sureties upon them from their liability? If this was the design, then the course adopted, of giving the company note for the amount so paid by Cole in discharge of their individual claims and of securing this note by a mortgage, was proper to accomplish the object, excepting for the provisions of the bankrupt law. But unless done for that purpose, what excuse can be suggested for the members of a firm applying one thousand dollars of its company property in discharge of their private debts, the firm at the time being insolvent? They had no right to so conduct with the property of the partnership for which they were then indebted more than they could pay, and they could not but be aware that thereby they were diminishing, to that extent, the assets which they had for the payment of their partnership creditors, who had an equitable claim upon their property, under these circumstances, for their security. When insolvents in such a condition so dispose of their partnership effects, I think it is an extremely charitable construction of their conduct, if I only infer that it was done for the purpose of preferring those who are benefited thereby. To many minds, I apprehend, it would present itself as worthy of a much severer judgment.

The excuse now suggested, that they wanted to take up the paper which was thus paid, so that they could give their attention to their business, is futile and vain. In the first place they left outstanding against them claims for nearly as large an amount of borrowed money as was paid, some of which was due to the very banks to which their payments were made. The very instant the mortgages of all their joint and separate estates were known to their creditors, their credit with them would be entirely ruined and destroyed. The slightest investigation of their affairs' would develop still more clearly their deep insolvency, and not a dollar could afterwards be obtained by them on credit. The inevitable consequence of such mortgages, as everybody well knows, is to put an end to further credit for a party, and break up and terminate his business; and especially would such be the results, when none of the demands due for merchandise were secured. The bank loans of the firm and private demands of the partners were protected by the mortgage. The bankrupts are not shown to have been wanting in ordinary intelligence. I must therefore hold them to have been well aware of, and intending the ordinary and usual result of such a proceeding, and that they could not have supposed that they would be able to continue their business after the execution of this conveyance, and that they intended a preference to the respondents by this assignment.

III. Did Cole and Hooper have reasonable

cause to believe the bankrupts insolvent, and that ·this conveyance was made in fraud of the act, that is, that a preference was intended?

Cole and Hooper swear, that they did not know· but that the bankrupts could pay their liabilities as they fell due in the ordinary course of business, that they had no knowledge of their insolvency, or suspicion that they had not property to pay their debts, and had no belief, or reason to believe, that either of them were insolvent, or in contemplation of insolvency or bankruptcy.

On reference to the 35th section of the bankrupt law, it will appear that the question is not what the party benefited by the conveyance actually believed as to the condition and intention of the bankrupt, but it is, what he had reasonable cause to believe on this subject. The language is, "the person receiving such conveyance, having reasonable cause to believe such person is insolvent, and that such conveyance is made in fraud of the provisions of this act."

The very same section declares, that when such conveyance is not made in the usual and ordinary course of business of the debtor, that fact shall be prima facie evidence of fraud.

This last provision is found at the close of the paragraph, which declares certain conveyances fraudulent when made within six months, and is not at the close of the preceding paragraph, declaring certain conveyances in preference of creditors and others fraudulent if made within four months. It may be contended therefore, that the presumption of fraud is applicable only in fraudulent conveyances, and not to preferences.

The provisions of the 35th section of the bankrupt act were extracted almost verbatim from the insolvent law of Massachusetts, and are to be found in the 89th and 91st sections of chapter 118, Gen. St. Mass., the 89th prohibiting fraudulent preferences, and the 91st fraudulent conveyances. At the close of the 91st sec. it is declared that "if such sale, &c., is not made in the usual and ordinary course of business of the debtor, that fact shall be prima facie evidence of such cause of belief." In the bankrupt act, the language is, "shall be prima facie evidence of fraud."

In Massachusetts, notwithstanding this provision is found at the close of the 91st section, and is not in the 89th, it has been decided, that it applied to causes under both sections. See Nary v. Merrill, 8 Allen, 451; Metcalf v. Munson, 10 Allen, 493. I am inclined to adopt this view as the true construction of this clause in the 35th section of the bankrupt act, especially as all the provisions are there united in a single section, and not found in different sections as in the Massachusetts act. Such, I understand, is the construction which has been given to this clause by the district courts.

It is too plain for argument, that this mortgage was not in the usual course of the bankrupts' business; it is therefore to be taken by me as fraudulent, unless the contrary is established. The burden is on the respondents to explain the transaction; this they have attempted to do by their absolute and unqualified statements, that they had no knowledge of the insolvency of the bankrupts, and had no belief or reason to believe that such was their condition, and that they did not receive the same with an intent to obtain a preference. Much of this statement was clearly inadmissible, and should have no influence upon the judgment of the court.

The question raised by the statute is not the actual belief of the respondents, but is what they have reasonable cause to believe, and if the acts and circumstances satisfy my mind that they had reasonable cause to believe that the bankrupts were insolvent and intended a preference, I am bound to declare the conveyance void, although I might be satisfied that the respondents were credulous enough to have believed the contrary.

In Coburn v. Proctor, 15 Gray, 38, Biglow, J., has clearly and conclusively expounded the like provision in the Massachusetts insolvent law. He says: "The actual belief of the defendants as to the solvency of the debtor was wholly immaterial. The only inquiry which, under the statute, was relevant to the issue was, whether the defendants had reasonable cause to believe the debtor insolvent, that is, whether in view of all the facts and circumstances, which were known to the defendants concerning the business and pecuniary condition of the debtor, in connection with the time and mode of the transfer of the property taken, they, as reasonable men, acting with ordinary prudence, sagacity and discretion, had good ground to believe that the debtor was insolvent. This was the only legitimate subject of inquiry as to the belief of the defendants, which could be properly gone into before the jury. It was not intended by the statute to make the actual belief of the party concerning the solvency of the debtor one of the standards by which to test the validity of the transfer of property to him. Such a belief might or might not be well founded. It would be an uncertain and fluctuating standard. That which would satisfy the mind of one man would be wholly insufficient to convince another; and those facts, which would fall far short of producing a belief in a person who was disinterested and impartial, might have a different effect upon the same person when acting under a strong influence of self-interest. In the place of a test so uncertain and unsatisfactory as the belief of a party, formed under a great bias, the statute established one much more safe and definite, equally applicable to all persons alike, and easily understood and readily applied by a jury—the belief of a reasonable

man taking a transfer of property under like circumstances."

Turning now to the facts and circumstances as here developed, what conclusions should a disinterested and impartial mind draw from them? One of the respondents was a director of the bank to which the bankrupts at this time were indebted $1,500, of which $750 was past due and unpaid; and for this the other respondent was liable; and although Cole swears that at the time he received the mortgage, he only knew that one note was past due at the banks, Chadbourne says: "That Cole and Hooper both knew from what was said to them, that these notes in the bank were overdue and unpaid." And it would certainly be somewhat unusual, if a bank director in Biddeford was ignorant that two notes held by the bank amounting to $750, and which had been taken in renewal of former discounts, remained overdue for some time, particularly when such director was himself a surety for the principal for larger sums due to other parties, a portion of which was also overdue. It is quite unreasonable to ask the court to presume a party to be so inattentive to his trust as a director, and so ignorant of the condition of one for whom he was so largely accountable.

From the evidence, I must conclude that Cole and Hooper were aware that the paper of the bankrupt to the amount of $1,250, and upon which one or the other were sureties, was overdue at the time of the negotiation of the mortgage, and that similar paper to a larger amount would soon fall due, none of which could the bankrupts discharge, excepting by a mortgage of their estate, as the bankrupts then informed them.

The language of Blatchford, J., in Re Dibblee [Case No. 3,884]. is quite applicable. He there says: "But, one overdue debt is sufficient to put a party in the condition of owing a debt which he is unable to pay. If, at the time the sheriff appeared with the execution to levy on the stock of goods, the firm owed this debt, and were unable to pay it in the ordinary course of their business, they were then insolvent in the language of the bankruptcy act and its meaning. No matter how many other debts there were not yet due, if they were unable to pay that debt in the 'ordinary course of their business,' they were insolvent. The ordinary course of their business does not mean an ability to turn out goods, or bills receivable, or assets, or securities, to pay that one particular debt, at the same time leaving other debts, which are certain to become due, unprovided for, and not leaving sufficient assets in the hands of the debtors to meet them when they become due. It is not in the ordinary course of business for a party who has a store of goods and other securities, and owes a mature debt, to turn out a large portion of those goods, or to take the most valuable of his securities and turn them over

to the creditor to extinguish that debt, if sufficient assets do not remain to pay the rest of his contracted debts in the ordinary course of his business. That is an extraordinary course of business, and not the ordinary course of business." That remark well characterizes this mortgage now under consideration. It was an extraordinary proceeding. These respondents not only had reasonable cause to believe the bankrupts were then insolvent, but from the information communicated to them by the bankrupts at the time of the negotiation for the security, I find that they had actual knowledge of the insolvency.

The bankrupts having intended a preference of the respondents, did they not, at the time, have reasonable cause to believe such was the design in giving the mortgage? Having already dwelt at some length on the facts and circumstances which have satisfied me that the bankrupts intended a preference, it is not necessary that they should again be repeated. It is sufficient to say, that I find that Cole and Hooper were perfectly cognizant of the most important of them, and as men of ordinary intelligence, they could not but have had reasonable cause to believe that it was intended to give them a preference. They were aware, that all demands for which they could be held liable, as well for the individual members as for the firm, and whether the same had matured or not, were to be paid, whilst other demands, held by the same banks, and upon which other parties were responsible as sureties, were left wholly unsecured; that by this arrangement, debts not due were anticipated, and thereby the discount which was paid was lost. The circumstance, that more than one thousand dollars of the property of the firm was thus applied to the discharge of the personal liabilities of the partners, and not to the firm debts, cannot but have a very great effect on my judgment. The defendants then well knew that the firm was heavily indebted for their stock in trade, and it should have remained unincumbered to be applied to the satisfaction of those debts, and the respondents should not have received this property for the security of their individual claims. They should have known it was grossly unjust, and that a firm thus conducting with their partnership assets could not be dealing fairly and honestly with the property. When it is found necessary to apply so large a proportion of firm property to the security of the individual indebtment of the partners, a court of equity should require plenary proof that it was not designed as a preference.

From all the evidence, I am forced to the conclusion, nowithstanding the statements of the respondents in their own behalf, that finding a large amount of the paper upon which they were responsible for the bankrupts was due and unpaid, and that a still larger amount would soon mature, in order to secure and

protect them, this scheme of paying these demands, both the overdue and those not yet matured, and taking a mortgage for the amount thus paid. was devised by the parties. It is quite apparent that they distrusted the solvency of the bankrupts, and were desirous of being relieved from their responsibilities. They did not propose to make these advances without security, and judging from their conduct, they were determined to be secured beyond all question. Chadbourne says his proposition at first was to mortgage the stock, but Cole demanded in addition a mortgage of Chadbourne's real estate. If they had no doubt of the bankrupts' ability to pay their liabilities, why take any security the effect of which would be so detrimental to the credit of the firm? If they were in good credit and believed by the respondents to be responsible, and the stock was so large as to afford ample security, why not at least be contented therewith, and be satisfied with the mortgage of that only, leaving the real estate of Chadbourne unincumbered? This would not answer their purpose; they were not willing to rely on the chattel mortgage, but they proposed and received in addition thereto a mortgage of all Chadbourne's real estate. Not satisfied with the lien on Chadbourne's homestead, they included in the mortgage the adjoining lot worth but a few hundred dollars, the whole proceeding, quite clearly indicating to my mind their distrust of the financial condition of their debtors, and their purpose to obtain security upon all the property which the bankrupts had to convey.

The parties appear to have been aware of the provisions of the bankrupt act, for Cole testifies: "I consulted with Mr. Goodwin as. to these mortgages, asking him if Chadbourne had spoken with him in regard to them, and he said that he had. and that he would make them out. I think that a question arose as to the validity of mortgages under the bankrupt law. He said that under certain circumstances they were not good. I think that he may have stated the circumstances."

Being thus advised of the provisions of the bankrupt act. it seems to me that these parties undertook to evade and circumvent it by paying the existing demands and taking new security therefor, which they claim by their answers as a present consideration for the mortgage. Such a proceeding cannot receive the sanction of a court administering the bankrupt law; and if the final result should be an entire loss to these respondents of all right to share in the bankrupts' estate it may not be entirely without profit and advantage, as it may prove a salutary lesson to them and the public generally, not to attempt to evade the provisions of so just and equitable a law as the bankrupt act.

They have read in evidence the testimony of the president and cashier of one of the Biddeford banks. and of other residents of that place. that in the opinion of these witnesses Chadbourne and Nowell. at the time of giving the mortgage, were solvent and in good credit, and that they would have loaned them money. A conclusive answer to this testimony is the belief of these respondents on these points, to be determined from their own conduct. They were unwilling to make the loan at that time, without receiving as security all the real and personal estate, both of the firm and of its members, and were so doubtful of the solvency of the firm that they were not content with the mortgage of all the company property. From their business relations with the bankrupts, I may well infer that the respondents were better cognizant of their situation and were unwilling to trust to their personal responsibility.

Decree for complainant declaring the conveyance void. Case referred to master to take account of property remaining, as well as of that sold by respondents.

[NOTE. Due report was made by the master, specifying the property received by the respondents under the mortgage, and the net proceeds of such portion of the same as they had sold and appropriated to their own use. Such of the property as remained in their possession they were required, by a final decree of this court, to deliver to the complainants. An appeal was then taken to the circuit court. where the decree of the district court was affirmed. Case No. 12,432.]